

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   06 CR 75-10 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| PETER ANDREW HOLLAND | ) | |
| also known as "thebinary" | ) | |

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, PETER ANDREW HOLLAND, and his attorney, CHRISTOPHER ATKINS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in Case No. 06 CR 75-10.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

1

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, PETER ANDREW HOLLAND, and his attorney, CHRISTOPHER ATKINS, have agreed upon the following:

1.      Defendant acknowledges that he has been charged in the Indictment in this case with: conspiracy in violation of Title 18, United States Code, Section 371 (Count One); and copyright infringement in violation of Title 17, United States Code, Section 506(a)(2) and Title 18 United States Code, Sections 2319(c)(1) and 2 (Count Ten).

2.      Defendant has read the charges against him contained in the Indictment, and those charges have been fully explained to him by his attorney.

3.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.      Defendant will enter a voluntary plea of guilty to Count One of the Indictment in this case.

5.      Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the Indictment.  In pleading guilty, defendant admits the following, which establish his guilt and relevant sentencing facts beyond a reasonable doubt:

Beginning at least in or about 2002, and continuing thereafter up to and including on or about June 29, 2005, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant did knowingly conspire and agree with his co-defendants to: willfully infringe a copyright by reproducing and distributing at least ten infringing copies of one or more

2

copyrighted works, with a total retail value of more than $2,500, during a 180-day period, in violation of Title 17, United States Code, Section 506(a)(2), and Title 18, United States Code, Section 2319(c)(1); circumvent a technological measure that protects a copyright work, by willfully, and for purposes of private financial gain, circumventing a technological measure that effectively controls access to a work protected under Title 17 of the United States Code, in violation of Title 17, United States Code, Sections 1201(a)(1)(A), and 1204(a)(1); and traffic in a technology, product, service, and device, by willfully, and for purposes of private financial gain, knowing that the technology, product, service, and device was primarily designed and produced for the purpose of circumventing a technological measure that effectively controlled access to a copyrighted work, in violation of Title 17, United States Code, Sections 1201(a)(2)(A), and 1204(a)(1), all in violation of Title 18, United States Code, Section 371.

More specifically, defendant and his co-conspirators were leaders, members, and associates of the software piracy group known as "RISCISO." "RISC" was an acronym for Rise in Superior Couriering, while "ISO" referred to a file format commonly used for the storage and transfer of pirated software. RISCISO was an underground organization, founded in approximately 1993, dedicated to the illegal distribution of large volumes of copyrighted software, games, and movies over the Internet, particularly recently released items, for the use and benefit of members and affiliates of RISCISO, and of persons to whom RISCISO members and affiliates further distributed those items.

3

In exchange for their contributions to RISCISO's unlawful objectives, members of the conspiracy received access through the Internet to computers that stored extensive libraries of illegally copied copyrighted software, games, and movies. (Computers used to maintain these libraries were referred to as "warez sites" or "warez servers".) RISCISO members set up computer servers that hosted warez sites used to store and distribute copyrighted software, movies, and games. Some members of the conspiracy devoted substantial time and resources to RISCISO-related activities.

Through the RISCISO servers, the conspirators obtained, and made available to others associated with RISCISO, unauthorized copies of copyrighted works, including software, movies, and games; moreover, the conspirators did not own the copyrighted works uploaded and downloaded on the RISCISO servers; and did not have the license, permission, or other authority from the owners of those copyrighted works to reproduce and distribute them or to make them available for downloading from RISCISO's servers.

The conspirators and other RISCISO members employed sophisticated security measures to conceal their activities, communications, and identities from law enforcement, and to ensure that only persons authorized by the leaders of RISCISO could gain access to the millions of dollars worth of software, movies, and games stored on RISCISO's servers. Security measures employed by members of the conspiracy included the following, among others: carefully screening persons to be given membership in RISCISO and access to its warez sites, for the purpose of ensuring that those admitted were committed to software

4

piracy, would benefit the organization, and were not affiliated with law enforcement; limiting access to RISCISO's warez sites to authorized users entering the site through known Internet Protocol ("IP") addresses with pre-established IDs and passwords; using private, invitation-only, password-protected Internet Relay Chat ("IRC") channels to communicate regarding the affairs of the conspiracy, and conducting those communications using screen names, rather than true names; using encryption to protect stored files; and using encryption to disguise what files were being requested for downloading by members in the IRC channel.

The RISCISO leadership, RISCISO members, and users of RISCISO-affiliated warez sites communicated with each other on private Internet Relay Chat ("IRC") channels, such as #risciso, #dvdiso, and others.  RISCISO members also made encrypted queries of the RISCISO server for particular files in the IRC channel at the same time they participated in conversations, and communicated with one another via direct IRC communication.  In their various IRC channels and communications, RISCISO members discussed, in real time, the activities of RISCISO, the invitation of new members to the group, the introduction of new users and software piracy groups to RISCISO-affiliated warez sites, and affiliation by RISCISO with other warez sites.  IRC channels were also used by the leaders of RISCISO to encourage and organize its members in distributing copyrighted software and finding additional resources to do so.  RISCISO members held group meetings in the IRC channel #risciso to discuss these matters.  An individual with the RISCISO username "chucky" was RISCISO's leader and typically led these meetings and set the agenda for them.

In approximately 1998, RISCISO members surreptitiously set up a warez server named "RM1". After a few years of use, this server was taken down. In approximately 2002, "chucky", "vman", and other RISCISO members set up other warez servers named "RM1" or "RM2." The RISCISO members who helped set up these warez servers received accounts on the servers and were allowed to download copyrighted content from them.

In or about December 2003, RISCISO members started using a new server named "RM2" to run concurrently with RM1 server that was operational. This RM2 server was administered by "vman". Unbeknownst to the members of the conspiracy, however, the computer hosting the RM2 server was maintained by a cooperating witness ("CW") who was assisting the government in its investigation of RISCISO.

In or about the end of 2004, RM1 started experiencing technical difficulties and finally went offline in or about April 2005. As a result, the RM2 server became RISCISO's main server for storing and distributing copyrighted software, movies, and games.

RISCISO members created a directory of the software, movies, and games available on the RISCISO servers that could be viewed by each user who logged on to the server. During their period of operation, thousands of copyrighted computer software programs, games, and movies were made available for downloading on the RISCISO servers, in violation of those copyrights. The types of copyrighted software made available on the RISCISO servers included, among others: operating systems; utilities; applications such as word processing programs, data analysis programs, spreadsheets, communications programs,

graphics, and desktop publishing programs; and games that could be played on computers and on stand-alone video gaming consoles such as Xbox or the Sony Playstation2.

During the time that RM2 was in operation, RISCISO members who were allowed access to RM2 by "chucky", "vman, and others, uploaded and downloaded approximately 19 terabytes of software, games, movies, and other files to and from the RM2 server. During the 180-day period ending on or about April 24, 2005, the copyrighted content uploaded to or downloaded from RM2 with a total retail value of more than $2,500, and included:

* software such as Ulead Picture Show 3 Deluxe, Microsoft Windows XP Media Center Edition 2005, Microsoft Streets and Trips 2005, Cakewalk Sonar4 Producer, Ahead Nero Burning Rom Version 6.6 Ultra Edition, Autodesk Mechanical Desktop Version 2006, Windows XP Pro 64-bit, Intel Fortran Compiler Version 8.1, Husqvarna Viking 3D Embroidery System, Hewlett-Packard Openview Network Node Manager Version 7.5, Roxio Easy Media Creator Version 7.5 and Windows Server 2003 Enterprise VL Edition;

* movies such as Sideways, The Pacifier, The Aviator, Closer, The Incredibles, Meet the Fockers, Hostage, Vanity Fair, Oceans 12, Spanglish, Shark Tale, Alexander, The Phantom of the Opera, Sin City, Flight of Phoenix, Collateral, and Robots; and

* games such as Tiger Woods PGA Tour 2005, Half Life 2, Tony Hawk's Underground 2, Tribes Vengeance, Super Streetfighter II, NASCAR Simracing, and WW II Sniper.

The total retail value of the software, movies, and games available for downloading on the RM2 server during its period of operation exceeded $4.3 million.

At times, RISCISO members trafficked in tools which were primarily designed and produced for the purpose of circumventing the access control and copy prevention systems embedded on digital copies of copyrighted works. Manufacturers of copyrighted software, movies, and games at times use various measures to protect against unauthorized use and

7

copying of their products.  At times software manufacturers make available evaluation or

"trial" versions of software applications that are programmed to expire after a certain time,

or that have been programmed to make unavailable certain functions in the software; in

addition, at times software manufacturers use mechanisms to block unauthorized copying of

the software.  RISCISO members at times identified, obtained, and tested tools to defeat

these protective measures.  These tools included "keygens" (small software applications that

generated licensing keys when executed), "serials" (licensing or product keys that could

enable a software's functions), and "cracks" (small applications that disabled the copyright

protection of software).  The keygens, serials, and cracks that were found to successfully

circumvent the manufacturer's protective measures by enabling trial versions to function

beyond the expiration of the "trial" period, or allowing users full access to software for which

no licensing fee had been paid, at times were placed into a directory on the RM2 server and

at times were posted in RISCISO's IRC channel for distribution to members.  The RISCISO

IRC channels were used by members to place requests for specific serials that would allow

requesting members to bypass the copyright protection of certain software without paying

a licensing fee.

The tools placed on the RM2 warez server and used by RISCISO members to

circumvent measures designed to limit access to certain software applications included, but

were not limited to, keygens for the following software applications: (a) FaceMorpher v. 1.5;

(b) ScriptFTP v. 1.4; (c) Backup to DVD CD v.5.1.138; (d) First.Alert Service

Monitor.v9.76.01; (c) NoClone.Enterprise.Edition.v3.1.204; (f) WorldTV.v7.1; and (g) ISOBuster.Pro.v1.8.0.4.

## The Defendant's Role in RISCISO

Defendant HOLLAND has been a member of RISCISO since at least December 2003 when he was recruited into the group by co-defendant Linda Waldron, (aka "bajantara" and "Linda Walrond"). HOLLAND initially met Waldron during a chat session in the IRC in non-RISCISO related channels. Waldron offered HOLLAND access to RISCISO warez servers from which he could download software, movies, and games. Waldron gave HOLLAND the technical data needed to access a private encrypted IRC channel, where they continued their conversation. When HOLLAND accessed the RISCISO servers RM1 and RM2, he used the nickname "the binary." HOLLAND knew that one of the RISCISO servers was hosted by Individual A in Los Angeles. This Los Angeles server was eventually taken over by RISCISO member "vman."

In or about DECEMBER 2003 / JANUARY 2004, HOLLAND met Waldron in person in Barbados. HOLLAND confirmed at that time that "bajantara's" real name was "Linda Walrond," a female in her sixties who resided in Barbados.

As a member of RISCISO, HOLLAND communicated with other members of RISCISO via the IRC. HOLLAND accessed and used RISCISO IRC channel #risciso to discuss furthering the objectives of the warez group and to search for the availability of certain copyrighted content on the warez serves. For example, on or about January 10, 2005, HOLLAND participated in a conversation in the IRC channel #risciso with fellow RISICSO

members and asked if anyone else was getting errors when they went into certain directories on RM2 like "tv" or "apps."

Based on his conversations with fellow RISCISO members in the IRC, HOLLAND learned personal information about them as well as their roles in the warez group. "Chucky" was the leader of RISCISO. "Stikk" or "kkits" operated a RISCISO server. "Supafly," whose real name HOLLAND knew to be "Jason Dobyns," also operated a server for RISCISO in California.

Between in or about December 2003, and June 29, 2005, HOLLAND accessed RM2 on numerous occasions. HOLLAND uploaded copyrighted content onto the RISCISO servers, including RM2. HOLLAND specialized in uploading Macintosh applications. During his use of RM2, HOLLAND acknowledges that he downloaded numerous software titles, movies, and computer or video games totaling at least 508 gigabytes with a retail value of at least approximately $512,086. Many more than ten of those works were protected by copyright and were of a value in excess of $2,500. In addition, during its existence, thousands of software program, games, MP-3 files, and movies were uploaded to RM2. Each time HOLLAND accessed RM2, he was able to view numerous directories containing information regarding activity on the site, including a directory of all of the software available for downloading on it. HOLLAND realized at the time that he engaged in these activities that it was illegal to reproduce and distribute copyright-protected software, games, and movies in this manner. HOLLAND did not own the copyrighted software, game, and movie titles maintained for downloading on RM2, and he did not have authority from the

owners of those copyrighted works to copy them onto his computer, make them available for downloading, or distribute them.

HOLLAND participated in the utilization of circumvention tools such as serials, keygens, and cracks to access copyrighted software by bypassing the technological security measures they contained to prevent such unauthorized access. HOLLAND knew that the crack or keygen was already installed on the software he downloaded and would allow the software to be fully functional when he execute it. HOLLAND also used the IRC to supply and make request of various keygens and cracks for particular software programs. HOLLAND include the serial number for an application when he uploaded the application to the RISCISO server.

Defendant HOLLAND acknowledges that the RM2 server contained at least 9,200 titles worth at least $4.3 million in total. In furtherance of the conspiracy and to accomplish its unlawful objectives, HOLLAND committed overt acts by logging in under his RISCISO alias "thebinary" to access RM2 and downloading the following copyrighted works on the specified dates:

|     | Date | Title of Copyrighted Work |
| --- | --- | --- |
| (1) | December 31, 2004 | Quark Xpress 6.0 |
| (2) | January 30, 2005 | iLife 2005 |
| (3) | April 8, 2005 | Windows Server 2003 32Bit Enterprise |
| (4) | December 31, 2004 | Mac OS X v. 10.4 Tiger |
| (5) | December 31, 2004 | Micromat TechTool Pro 4 |
| (6) | January 26, 2005 | iWork |

| (7) | February 26, 2005 | Adobe Acrobat Professional 7.0 |
| (8) | February 8, 2005 | Kaplan Higher Score For GMAT 2005 |
| (9) | February 12, 2005 | VMWare Workstation v. 4.5.2 |
| (10) | February 26, 2005 | Adobe Acrobat 7 Professional Internal |

The foregoing recitation of facts represents a summary of defendant HOLLAND's knowledge of the charged conduct for purposes of providing a factual basis for his guilty plea. It does not contain every fact known to HOLLAND about the events described herein.

6.    For purposes of calculating the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree and, where noted, disagree on the following points:

(a)    The Sentencing Guidelines to be applied in this case are those effective November 1, 2004.

(b)    The base offense level for the offense of conviction pursuant to Guideline § 2B5.3(a) is level 8.

(c)    The ascertainable value of the infringed items uploaded to the RM2 server is at least $4.3 million, and accordingly, pursuant to Guideline § 2B5.3(b)(1) and § 2B1.1(b)(1)(J), the base offense level is increased an additional 18 levels.

(d)    Pursuant to Guideline § 2B5.3(b)(2), the offense level is increased an additional 2 levels because the offense involved the uploading of infringing items.

(e)    Because the offense was committed for purposes of commercial advantage and private financial gain, the defendant is not entitled to the two-level decrease provided in Guideline § 2B5.3(b)(3).

(f)     Pursuant to Guideline § 3B1.3 and Application Note 4 of Guideline §2B5.3, defendant's offense level is increased 2 levels because defendant's conduct involved the circumvention of a technological security measure to gain initial access to an infringed item.

(g)     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions, within the meaning of Guideline §3E1.1, a two-level reduction in the offense level will be appropriate.

(h)     Pursuant to Guideline § 3E1.1(b), an additional one-level reduction in offense level is appropriate because the defendant has notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently; provided that the Court determines the offense level to be 16 or greater prior to the operation of Guideline 3E1.1(a).

(i)     Based on the facts known to the government, defendant's criminal history consists of a conviction on or about July 29, 2005, for Disorderly Conduct in Middletown Municipal Court in Middletown, Ohio, for which defendant was assessed a $100 fine and court costs. Pursuant to Guideline § 4A1.2(c)(1), no criminal history points are assessed for this conviction.

(j)     Based on the facts known to the government, defendant's criminal history points equal one and defendant's criminal history category is I.

(k)     Based on the preliminary calculations above, defendant's projected offense level is 27, defendant's projected Criminal History Category is I, and the projected applicable guideline range is 70-87 months in Zone D.

(l)     Defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

(m)     The defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

7.     Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8.     Defendant understands that the charge to which he is pleading guilty carries a maximum penalty of five years imprisonment, a maximum fine of the greater of $250,000 or twice the gross pecuniary gain to defendant or twice the gross pecuniary loss resulting from the offense, as well as any restitution which the Court may order. Defendant further understands that this charge also carries a term of supervised release of at least two but not more than three years, which the Court may specify.

9.     The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $100 at the time of sentencing with cash or a money order made payable to the Clerk of the U. S. District Court.

10.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a)     If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b)     If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the

jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty as to each count. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt as to each count.

(c)     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt as to each count.

(d)     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

11.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the

consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

12.   The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction or the manner in which that sentence was determined, on the grounds set forth in Section 3742 or on any ground whatever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives her right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

13.   Defendant agrees that he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate that is related to or results from the charges in this case.

(a)   Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or court proceeding.

(b)   Defendant agrees to postpone his sentencing until after the conclusion of the prosecution of his co-defendants.

14.     Defendant understands that the Indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

15.     Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

16.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline 5K1.1, to depart from the applicable guidelines range.   The parties have agreed that the government shall recommend that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of two-thirds of the low-end of the applicable guidelines range. Defendant understands that the decision to depart from the applicable guideline range and the extent of any such departure rests solely with the Court.

17.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose the maximum penalties as set forth in paragraph 8 above. However, the sentencing court is obligated to consult and take into account the Sentencing Guidelines in imposing a reasonable sentence. The defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

18.    The Indictment charges that because the defendant knowingly engaged in conduct in violation of Title 17, United States Code, 506(a)(2) and Title 18, United States Code, Sections 2319(c)(1), he is subjected to forfeiture to the United States, pursuant to Title 18, United States Code, Section 506(b), any infringing copies of any copyrighted works and all implements, devices, or equipment used in the manufacture of such infringing copies, including but not limited to the following seized items:

* Toshiba Cable Modem Model PCX 2200 SN 3209818207
* PDA "Sharp" SN 27031572
* Wireless Remote "Linksys" 2.4 GHz SN G3120318089
* 8 Port Workgroup Switch "Linksys" MN EZXS88W,2 Adaptors
* Cell Phone "Sanyo" Sprint MN PM-8200 ESN 04504824300 w/battery and Charger
* Cell Phone "Samsung" T-Mobile SN R4TX986501Z w/battery
* Pager "Motorola" AR# AC111804017
* Security ID "RSA Securid" 805827 on Screen SN 23539366 12/31/2009
* 8 IBM OEM Hard Drives SN WFJC2333
* Seagate Barracuda Hard Drive, ATA SN 7BY04X7P
* Maxtor Hard Drive, MD 5T060H6 SN T6H1T7KC
* IBM Deskstar Hard Drive, SN YHF28680
* Western Digital Hard Drive, WD2500 SN WMAEH2666414
* Western Digital Hard Drive, WD800  SN WCAM94128762
* Maxtor Diamondmax Plus Hard Drive, 9 SN Y647RB03
* Hitachi Travelstar SN on Envelope L4HGWMV8
* External Hard Drive "Combo" Silver Box Plastic Ends
* Maxtor Hard Drive, MN 96147U8 SN N809KF9C
* IBM Deskstar Hard Drive, SN TXGC0989 "Bad"
* Maxtor Hard Drive, MN 98196H8 SN V8054AVC
* Samsung WNR-32100A SN J39G721865 OR0024S1CG741868
* Flat Screen Monitor "Dell" SN CN0C0646466334C01H3L
* Flat Screen Monitor "Dell" SN CN0C06464663348L3RKL
* Flat Screen Monitor "Sony" Silver SN 4006858
* CPU White Tower No Brand Name, No Serial Number Drives CD-RW/3.5
* Server Blk No Brand Name or Serial Number Drives CD/3.5
* CPU White Tower "Antec Outside" No Serial Number Drives 3.5

* CPU Black Tower "Lianli" No Serial Number "PC-7B"
* Drives DVD-R/3.5/3 Drive Bays w/Digital Temp Controls
* CPU Black Tower "Lianli" No Serial Number "PC-61" Labeled "Computer 1"  Drives DVD-R/3.5
* CPU White Tower "Compaq Presario 4710" SN 6637HXJ2D378 DRIVES CD-R/3.5
* CPU"Gateway 2000" LP Mini Tower SN 0007992691 Drives CD-R/3.5
* "Super Server" Black Model 5013C-M  SN 5013CM14B01210 Drive 3.5/CD-R
* Laptop "Sony Notebook" Model PGG-4311 SN 283241303200652
* Laptop "Dell Inspirion Pp01x"  SN 31YZC11 with Mouse and Power Adaptor
* Laptop "Apple Powerbook G4" Silver 17" Screen, No Serial Number Power Cords with Keyboard SN KY346117RPA3D
* Laptop "Toshiba" Model PA1232UXCD SN 027503513 Drives CD-R with Power Cords CD Burner-TDK Brand

19.   By pleading guilty to offense charged in the Indictment, the defendant understands that any property, real or personal, described above, as a result of these violations is subject to forfeiture.

20.   Defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has to any other property specified in paragraph 18 above so that these items may be disposed of according to law.  Defendant is unaware of any third party who has an ownership interest or claim to the property in paragraph 18 that is subject to forfeiture and will cooperate with the United States during the ancillary stages of any forfeiture proceedings to defeat the claim of a third party in the event a third party files a claim.

21.    Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or other penalty the Court may impose upon the defendant in addition to the forfeiture judgment.

22.    Regarding restitution, the parties agree that the number of identifiable victims in this case is so large as to make restitution impracticable, and that determining complex issues of fact related to the amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.  Accordingly, pursuant to Title 18, United States Code, Section 3663A(c)(3), restitution is not mandatory.  The defendant understands that Title 18, United States Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing Guidelines set forth the factors to be weighed in setting a fine and restitution and in determining the schedule, if any, according to which restitution is to be paid in this case.  The defendant agrees to provide full and truthful information to the court and United States Probation Officer regarding all details of his economic circumstances in order to determine the fine and restitution and the proper restitution schedule according to which the defendant may be ordered to pay.  Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court.

23.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands

that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant.

24.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

25.     Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

26.     Should the judge refuse to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

27.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to this defendant.

28.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: __6-2-06__

_Daniel Hochner, for PJF_
PATRICK J. FITZGERALD
United States Attorney

_Peter Holland_
PETER ANDREW HOLLAND
Defendant

_Pravin Rao_
PRAVIN B. RAO
Assistant United States Attorney

_Chris Atkins_
CHRISTOPHER ATKINS
Attorney for Defendant